UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARMEN AUTO SALES III, INC.,

    Plaintiff,

v.

CITY OF DETROIT, *et al.*,

    Defendants.

Case No. 16-12980
Honorable Laurie J. Michelson
Magistrate Judge David R. Grand

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [24, 26]**

On May 11, 2016, the City of Detroit towed eighty-five vehicles belonging to Carmen Auto Sales that were illegally parked on a vacant, Detroit lot. Carmen Auto believed it had leased the lot from a company called First United Enterprises. But as of May 11, 2016, First United had yet to finalize the lot's purchase from the City.

Detroit police officers knew the lot from a prior investigation. When they saw all of the cars parked on it, they grew suspicious. After triple-checking to make sure Detroit owned the lot, the police called Gene's Towing to impound the cars. Gene's Towing called B&G Towing for help.

Carmen Auto did not reclaim the cars. Instead, they filed suit against the towing companies, the City of Detroit, a Detroit Police Lieutenant, and a city inspector. In the meantime, the cars were sold at public auction.

All Defendants now move for summary judgment. For the reasons that follow, the motions will be granted.

**I.**

Sometime in 2015, First United Enterprise Corporation offered to buy a vacant lot from the City of Detroit. (R. 31, PID 984.) First United wanted to use the vacant lot to store excess inventory for a used car dealership. (*Id.*) In December 2015, First United and Detroit's Planning and Development Department entered into a purchase agreement outlining the sale's terms. (*Id.*; R. 26, PID 855.) The purchase agreement required approval by the Detroit City Council. (R. 31, PID 984; R. 26, PID 855). On January 19, 2016, the City Council adopted a resolution allowing the sale to go forward. (R. 31, PID 964, 988; R. 26, PID 856–58.) Importantly, the resolution did not finalize the sale; in fact, the resolution made clear that any sale would not be final until Detroit's Corporation Counsel approved the deed.[1] (R. 31, PID 986; R. 26, PID 857.)

On February 23, 2016, the Planning and Development Department prepared and executed a draft deed. (R. 26, PID 859; R. 31, PID 990.) As required, the deed went to the Corporation Counsel's office for final approval. (R. 26, PID 850; R. 31, PID 963.) But the Corporation Counsel's office rejected the deed due to "an error in the legal description of the property to be conveyed." (R. 26, PID 851.) Corporation Counsel returned it to the City Council. (*Id.*)

By April 2016, the City Council fixed the errors and sent a corrected deed to the Corporation Counsel's office. (R. 26, PID 851, 861–64.) On May 19, 2016, the Corporation Counsel's office signed off on the corrected deed. (R. 26, PID 865.) It then forwarded the deed to the Detroit Building Authority, who, on May 27, 2016, recorded it in the Wayne County Register of Deeds. (R. 26, PID 853.) So on or about May 27, 2016, the City of Detroit legally conveyed the vacant lot's title to First United. (R. 26, PID 714.)

---

[1] Section 7.5-206 of Detroit's charter requires the Corporation Counsel approve all "contracts, bonds and other written instruments in which the City is concerned" (including deeds). (R. 26, PID 713)

But First United did not wait until May 27, 2016 to begin using the lot. About a month earlier, First United attempted to lease the lot to Carmen Auto. (R. 31, PID 965–66.) On April 28, 2016, Carmen Auto began storing used cars on the lot. (*Id.*)

At the time, Detroit Police Lieutenant Jonathan Parnell supervised the Detroit Police Department's Commercial Auto Theft unit. (R. 26, PID 755.) On May 11, 2016, Parnell noticed cars parked in the vacant lot. (*Id.*) He was familiar with this vacant lot: months earlier his department conducted an investigation into an unlawful auto scrapping business operating on it. (R. 26, PID 756.) As part of the scrapping investigation, Parnell learned the city owned the lot. (*Id.*)

So on May 11, 2016, when Parnell saw cars parked on what he believed was still a city-owned lot, he began another investigation. (R. 26, PID 757.) Parnell ran a title search on the vehicles, and none came back stolen (but none were titled to Carmen Auto, either). (R. 26, PID 769, 771.) Then Parnell called two city inspectors to see if the city still owned the property. (R. 26, PID 764.) One of the city inspectors, Jeff Bou, arrived at the lot soon after. (*Id.*) Bou also knew the lot from the previous investigation, and had paperwork indicating the city still owned the lot. (R. 26, PID 809.) To confirm the paperwork, made a series of calls to government offices and determined that Detroit still owned the lot. (R. 26, PID 846.)

Once Bou and Parnell confirmed that the city still owned the lot, Parnell cut a chain lock on the lot's gate (R. 31, PID 979), and called Gene's Towing to remove the vehicles (R. 26, PID 762). Gene's Towing had a towing contract with Detroit. (R. 26, PID 772.) Due to the size of the job, Gene's Towing contacted B & G Towing to help. (R. 26, PID 762.)

Not long after the tow trucks arrived, "various people" claiming to be representatives for Carmen Auto arrived and told Parnell the lot had been purchased. (R. 26, PID 765, 846.) One of

the individuals produced either a purchase agreement or the City Council resolution approving the purchase agreement. (*Id.*; R. 26, PID 831–32.) To check on the validity of the purchase agreement, Parnell once again phoned city inspectors and city offices to see if the sale had gone through. (R. 26, PID 842.) Parnell's second round of phone calls confirmed that the sale was not final and the lot still belonged to Detroit. (*Id.*)

After Parnell's second round of calls, another Carmen Auto representative claimed to have a lease agreement for the lot. (R. 26, PID 766.) Parnell asked to see it. (R. 26, PID 766.) Parnell also urged the representative to bring title information for the vehicles. (R. 26, PID 766–771.) About an hour later, the representative returned, but without any paperwork. (R. 26, PID 766–67.)

Even so, Parnell made a third round of calls to again make sure the city owned the lot. (R. 26, PID 768.) This time he called officials with Detroit and Wayne County. (*Id.*) All confirmed that Detroit owned the lot. (*Id.*) And none of the "various people" who arrived at the lot ever produced documentation showing that an entity other than Detroit owned it. (R. 26, PID 835, 847.) Nor did any of these Carmen Auto representatives ever produce a lease agreement, title information for the vehicles, or a permit to store used cars on the lot. (R. 26, PID 843.)

As parking the vehicles on a city-owned lot violated city ordinances (R. 26, PID 827), Parnell ordered the towing operation to continue (R. 26, PID 769–71). He made clear to Carmen Auto's representatives that the impound was not part of a criminal investigation. (R. 26, PID 780–81.) Parnell also told the towing companies the cars were not "'on hold' for evidentiary purposes." (R. 24, PID 286.)

Once the towing companies removed all eighty-five vehicles, Parnell explained to Carmen Auto's representatives that they should contact the towing companies to arrange the release of the vehicles. (R. 26, PID 780.) Parnell says he told Carmen Auto representatives "numerous" times

4

how, where, and when to retrieve the towed vehicles. (R. 26, PID 780–81.) Yet Carmen Auto never recovered the vehicles. So they sat in the towing companies' yards for two or three months and were eventually sold at public auction. (*Compare* R. 24, PID 281 *with* R. 24, PID 286.)

Not long after the sale, Carmen Auto sued the towing companies, the City of Detroit, Parnell, and Bou. Carmen Auto brought claims under 42 U.S.C. § 1983 because they say the tow operation violated their Fourth Amendment due process rights. (R. 1, PID 6–7.) Carmen Auto also asserted a number of state law claims. (R. 1, PID 7–15.)

All Defendants now move for summary judgment.

**II.**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. To prevail on summary judgment, the defendants must point out "that there is an absence of evidence to support [Carmen Auto's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Should the Defendants carry their burden, then Carmen Auto "must come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If Carmen Auto presents facts showing a genuine issue for trial, then the Court has to weigh whether the Defendants nonetheless prevail as a matter of law, or whether a jury should decide Carmen Auto's claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). At that point, the Court views the evidence and makes all reasonable inferences in the light most favorable to Carmen Auto. *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

5

**III.**

Gene's Towing and B&G Towing—the towing companies—say they deserve summary judgment either because they are not state actors or because they did not violate Carmen Auto's constitutional rights. The City of Detroit, Bou, and Parnell—the City Defendants—say they deserve summary judgment for two reasons. For one, they claim a Michigan statute strips this Court's power to hear Carmen Auto's § 1983 claim. Second, even if the Court has jurisdiction, as a matter of law Carmen Auto cannot establish any constitutional violations.

**A.**

Because the City Defendants' subject-matter-jurisdiction argument implicates a federal court's power to even hear this case, *see Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 790 (6th Cir. 2012), the Court will start there.

The City Defendants say Carmen Auto challenges a vehicle tow. And they say the Michigan Motor Vehicle Code governs any and all disputes arising out of a vehicle tow. (R. 26, PID 722–23.) The Motor Vehicle Code's jurisdictional provision vests exclusive power in the state district courts to hear any and all challenges to vehicle tows. *See* Mich. Comp. Laws § 257.252e(1). So the City Defendants argue that the Michigan Motor Vehicle Code strips a federal court of its power to hear federal claims arising out of this vehicle tow. (R. 26, PID 723.)

The City Defendants cite *Gilbert-Rutter v. Parkview Towers*, No. 16-11010, 2016 U.S. Dist. LEXIS 94399, at *5–6 (E.D. Mich. July 20, 2016).(R. 26, PID 722.) In *Gilbert-Rutter* a federal court said it lacked subject-matter jurisdiction over a "constitutional" challenge to a vehicle tow. *Gilbert-Rutter*, 2016 U.S. Dist. LEXIS 94399 at *5. However, it is not clear that the *pro se* plaintiff's complaint involved a federal, constitutional claim. And even if it did, Congress—not a

state legislature—controls federal court jurisdiction. *See* U.S. Const. art. III, art. IV, cl. 2; *Osborn v. President, Directors & Co. of Bank*, 22 U.S. 738, 819–20 (1824).

Plus, nothing in § 257.252e(1) of the Michigan Motor Vehicle Code limits a federal court's jurisdiction to hear federal claims. The statute says that only state district or municipal courts may "determine if a police agency, towing agency or custodian . . . has acted properly in reporting or processing a vehicle under section 252a, 252b(6) to 11, or 252(d) . . . ." Mich. Comp. Laws § 257.252e(1). So by its terms, the statute confers jurisdiction in specific courts for a specific purpose: to hear challenges to towing procedures as laid out in the Motor Vehicle Code. *Id.* For example, the statute's "specific grant of jurisdiction" limits which courts may "determine whether a police agency has properly processed an abandoned vehicle." *See Citizens Bank v. Atlas Distributing, Inc.*, No. 261584, 2005 WL 2401868, at *1–2 (Mich. Ct. App. Sept. 29, 2005). How to properly process an abandoned vehicle is entirely a creature of the Motor Vehicle Code. *See* Mich. Comp. Laws 257.252b(6). The statute does not address federal claims or federal courts.

In short, the Court does not believe that Mich. Comp. Laws 257.252(e)(1) deprives it of jurisdiction to address Carmen Auto's claims raising federal, constitutional violations.

**B.**

Turning to the merits, Carmen Auto must establish two elements to prevail on its § 1983 claims: "1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003). Carmen Auto claims violations of its Fourth Amendment and due-process rights. But the City Defendants rightly show that Carmen Auto cannot establish a violation of either constitutional right, and therefore cannot satisfy the first element.

**1.**

Carmen Auto says the City Defendants authorized a warrantless raid of Carmen Auto's private property and the subsequent warrantless seizure of Carmen Auto's autos. Carmen Auto also seems to argue that Parnell lacked the authority to conduct the tow operation because he was an officer in DPD's Commercial Theft unit. As the cars were not stolen, DPD's Abandoned Vehicles unit should have conducted the operation. So the entirety of the seizure was unreasonable.

In response, the City Defendants say it is factually undisputed that the City of Detroit owned the vacant lot on May 11, 2016—the day the city towed Carmen's autos. And the City Defendants say there is nothing unreasonable about removing unlawfully parked cars from city property. The City Defendants also point out that Carmen Auto never produced a lease agreement for the lot, nor any title information for the cars towed. So Carmen Auto has not established any property rights in the lot or the vehicles.

The Fourth Amendment proscribes "unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Thus, when evaluating a government's search or seizure, "reasonableness" is "the ultimate touchstone" of any Fourth Amendment inquiry. *Michigan v. Fisher*, 558 U.S. 45, 47 (2009). And the Supreme Court provides two guideposts for conducting the reasonableness analysis. One way holds that the Fourth Amendment protects people: the question there is whether an individual subjectively manifested an "expectation of privacy" that society recognizes as objectively reasonable. *See Katz v. United States*, 389 U.S. 347, 380 (Harlan, J., concurring). The other path reflects the Amendment's longstanding connection to property rights: the inquiry there is whether a government official engaged in a "physical intrusion" into the private property of another. *United States v. Jones*, 565 U.S. 400, 404–05 (2012). In sum, if an individual enjoys an

objectively reasonable expectation of privacy—or the government physically intrudes into the private property of another—the government needs to get a warrant, absent special circumstances.

Starting with the *Katz* approach, Carmen Auto subjectively manifested an expectation of privacy in the lot. They moved eighty-five cars onto a vacant lot they say they were leasing. And they locked the lot's gate using a chain that Parnell had to cut when he arrived on May 11, 2016.

However, Carmen Auto cannot establish an objectively reasonable expectation of privacy. Recall that the tow operation occurred on May 11, 2016. On that date, the record establishes that the proposed sale of the lot was still in process because Detroit's Corporation Counsel had yet to sign off on a correct deed. (*Compare* R. 26, PID 713 *with* R. 31, PID 963.) And legal transfer of the title to First United did not occur until May 27, 2016—16 days after the tow. (R. 26, PID 865); *Resh v. Fox*, 112 N.W.2d 486, 488 (Mich. 1961).

There is no dispute: on May 11, 2016, the City of Detroit still owned the lot. And there is nothing in the record that indicates they gave Carmen Auto permission or any right to park their cars there. Because Detroit owned the lot, Carmen Auto was either a trespasser or a squatter. And both struggle to maintain an expectation of privacy that society recognizes as objectively reasonable. *See United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) (trespasser had no reasonable expectation of privacy in a vacant property on which he was staying); *see also Zimmerman v. Bishop*, 25 F.3d 784, 788 (9th Cir. 1994) (holding that a trespasser's invited guest likewise cannot show an objectively reasonable expectation of privacy); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980) (trespasser could not claim Fourth Amendment rights in a vehicle for which the trespasser did not have documentation indicating ownership or registration of a vehicle). Despite the fact that Parnell asked Carmen Auto to produce a lease, Carmen Auto never did so—nor have they entered one into the record. Carmen Auto also has not provided title

9

information for the eighty-five vehicles towed. Finally, the lot was an open space, available for anyone to inspect, further diminishing any objectively reasonable privacy expectation. *See, e.g.*, *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 351 (1977) ("[T]he seizures of the automobiles in this case took place on public streets, parking lots, or other open places, and did not involve any invasion of privacy"). So Carmen Auto cannot establish a Fourth Amendment violation under the *Katz* approach.

Nor may trespassers rely on the property theory of the Fourth Amendment. Under the property theory, trespassers do not have the lawful property right they need to trigger Fourth Amendment protection. *See Florida v. Jardines*, 569 U.S. 1, 5–6 (2013) (holding that government interference with individual property rights establishes a baseline for Fourth Amendment protection in addition to the *Katz* test); *Jones*, 565 U.S. at 405 (citing *Entick v. Carrington*, 95 Eng. Rep. 807 (C.P. 1765)). Thus, Carmen Auto cannot rely on the property theory to establish a Fourth Amendment violation committed by the City Defendants.

Moreover, Carmen Auto's cars were illegally parked on a city-owned lot. And the City Defendants did not transgress the Fourth Amendment by impounding cars parked in violation of city ordinances. *See South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) ("Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic."). Bolstering that conclusion, Parnell told Carmen Auto's representatives that the tow operation was not part of a criminal investigation, only ordinance violations.

Carmen Auto's attempts to create material issues of fact for trial are unavailing. First, Carmen Auto thinks a draft deed, signed by the director of Detroit's Planning and Development Department, conferred lawful title in February of 2016. (R. 31, PID 964.) But the February 2016

deed was not accepted by Detroit's Corporation Counsel, and Carmen concedes the Corporation Counsel needed to accept the deed for the sale to be legally final. (R. 31, PID 963.) Carmen Auto also says Parnell had no authority to conduct the tow operation because he was not a member of the Abandoned Vehicles Unit. Yet Carmen Auto does not explain how this is legally significant. Parnell's assignment has no bearing on the status of the lot's ownership as of May 11.

In sum, the City Defendants correctly point out that Carmen Auto cannot establish the first element of a § 1983 claim with respect to their Fourth Amendment claim. And there are no genuine issues of material fact requiring trial. So summary judgment for the City Defendants is appropriate.

## 2.

The City Defendants also seek summary judgment on Carmen Auto's due process claim. Carmen Auto says the City Defendants towed the vehicles without prior notice, and then failed to provide any assistance after the tow. As a result, Carmen Auto charges it could not comply with the impound notices. So Carmen Auto raises a procedural-due-process challenge to the tow operation. In response, the City Defendants argue they did not need to provide pre-towing notice and contend that Carmen Auto's failure to reclaim the vehicles is not the city's fault.

To establish a procedural-due-process claim, Carmen Auto must show that it was deprived of a constitutionally "protected [property] interest within the meaning of the Due Process clause, and that the state did not afford adequate procedural rights before depriving [it] of [its] protected interest." *Henry v. City of Middletown*, 655 F. App'x 451, 462 (6th Cir. 2016) (citing *Med. Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002)).

Even if Carmen Auto had a cognizable property interest in the vehicles, the due process clause does not require notice prior to a police tow. *See Ross v. Duggan*, 402 F.3d 575, 583–84 (6th Cir. 2004); *Duffy v. City of Stanton*, 423 F. Supp. 2d 683, 688 n.2 (E.D. Ky. 2006); *see also*

11

*Sutton v. City of Milwaukee*, 672 F.2d 644, 648 (7th Cir. 1982) (Posner, J.). Rather, the due process clause requires only that Carmen Auto receive adequate post-deprivation notice and opportunity to be heard. *Ross*, 402 F.3d at 584.

Resisting this conclusion, Carmen Auto says the City Defendants failed to "respond to the Plaintiffs['] requests for assistance after the vehicles were impounded . . . ." (R. 1, PID 8) And so Carmen Auto was "unable to avail [itself] of any local due process procedures in the time frames set forth in their impoundment notices." (*Id.*) Carmen Auto never explains this allegation.

To the extent Carmen Auto claims the City Defendants withheld the impoundment notices or other information, the record shows otherwise. The vehicles sat in a towing company yard from May 11 to at least July 19, 2016. Carmen Auto does not dispute that Parnell double checked the impound notices against Gene's Towing records. (R. 26, PID 780.) Nor does Carmen Auto dispute that Parnell spoke with the owner of Carmen Auto on May 11 and "numerous" times afterwards to tell him where, when, and how to retrieve the cars. (R. 26, PID 780–82.)

Finally, Carmen Auto does not challenge any specific, post-deprivation procedure provided by the Motor Vehicle Code, does not challenge the availability of post-deprivation notice and hearing, and does not challenge the forfeiture of the vehicles.

At bottom, Carmen Auto cannot show a procedural-due-process violation. As such, the City Defendants have carried their burden to show Carmen Auto cannot establish the first element of a § 1983 claim. And Carmen Auto has not produced material factual issues for trial. So once again, summary judgment in favor of the City Defendants is appropriate.

**C.**

Carmen Auto brings the same § 1983 claims against the towing companies. (R. 1, PID 6–9.) The towing companies move for summary judgment, alleging, among other things, that they

are not state actors. In other words, the towing companies argue Carmen Auto cannot establish the second element of a § 1983 claim: that any constitutional violations were "caused by a person acting under color of state law." *Tahfs*, 316 F.3d at 590.

The towing companies are private businesses and so not "state actors." *See Moldowan v. Warren*, 578 F.3d 351, 399 (6th Cir. 2009).Yet even private businesses may act "under color of law" if their conduct is "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *Moldowan*, 578 F.3d at 399. To see if a private business's conduct is "fairly attributable to the state," courts rely on either a "public function" test, a "state compulsion" test, or a "nexus" test. *Moldowan*, 578 F.at 399. The public function test applies where a private business performs state operations, like "running elections." *Id.* The state compulsion test applies where "the state significantly encouraged or somehow coerced the private party . . . to take a particular action. . . ." *Id.* And finally, the nexus test "requires a sufficiently close relationship (*i.e.* through state regulation or contract) between the state and the private actor . . . ." *Id.*

The towing companies have a contract with the city of Detroit, so the best fit for this case is the nexus test. *See, e.g.*, *Plummer v. Detroit Police Department*, No. 17-10457, 2017 WL 1091260, at *3 (E.D. Mich. March 23, 2017). The nexus test requires a private actor engage in something "more than joint activity with the state . . . ." *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 412 (6th Cir. 2006). Something more means Carmen Auto needs to show "'pervasive entwinement' between [the towing companies and Detroit] surpassing that of a mere contractual relationship." *Id.* (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303 (2001)).

On the undisputed record, Carmen Auto cannot establish "pervasive entwinement." The towing companies are two of about twenty companies with a towing contract with Detroit. (R. 24,

PID 270.) Of the roughly twenty towing companies, Gene's and B&G were two of the handful that had the capacity to handle large tow operations. (R. 24, PID 312.) Because of their ability to handle larger, "industrial tows," Parnell called Gene's to tow the roughly eighty-five vehicles. (*Id.*) From there, Gene's called B&G for help. (R. 24, PID 285.) These towing companies were not involved in the decision to tow the cars. They simply responded to the call because they had availability. (R. 24, PID 272.) Had the towing companies been otherwise engaged, Parnell would have had to call other companies. (*Id.*) Finally, after the tow operation finished, Parnell tried to "stay out" of Carmen Auto's dealings with the towing companies because Parnell's investigation was over. (R. 26, PID 782.)

So the undisputed record shows that the private towing companies did nothing more than fulfill their contractual obligations. And "[a]cts of . . . private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982). Nor is a "mere contractual relationship" between the towing companies and Detroit enough to satisfy the nexus test. *See, e.g.*, *Partin v. Davis*, 675 F. App'x 575, 587 (6th Cir. 2017) (reasoning that a contractual relationship with a government entity alone is not enough to turn a private towing company into a "state actor"); *Plummer*, 2017 WL 1091260, at *4 (holding that Gene's Towing is not a state actor simply because it has a towing contract with Detroit). That is especially true in the context of a civil matter, as opposed to a criminal investigation. *See Smith v. Insley's Inc.*, 499 F.3d 875, 880 (8th Cir. 2007) (holding that a private towing company was a state actor because the towing company performed the "traditional government function" of seizing and storing evidence in a criminal investigation).

Carmen Auto attempts to show pervasive entanglement by arguing the towing companies are part of a "criminal conspiracy" with Detroit. (R. 31, PID 958–59.) As part of the conspiracy,

Carmen Auto, relying solely on an ongoing investigation, alleges the founder of Gene's Towing bribed Clinton Township officials to receive a towing contract for another of his companies. (R. 31, PID 958.) Carmen Auto lays out a timeline of the alleged Clinton Township bribes and notes that they occur within weeks or months of the events in this case. (R. 31, PID 960–61.)

It is true that bribery on the part of private officials may lead to the private parties' § 1983 liability. *See Dennis v. Sparks*, 449 U.S. 24, 27–29 (1980) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970). And one circuit attaches § 1983 liability to private parties willfully engaged in a "corrupt conspiracy" to bribe public officials. *See DuBose v. Kelly*, 187 F.3d 999, 1003 (8th Cir. 1999). But the corrupt conspiracy must be established with admissible evidence and related to the alleged constitutional violation. *DuBose* involved a conspiracy between a judge and a lawyer to "fix" DuBose's case. 187 F.3d at 1003. Likewise, Dennis was a state judge who accepted bribes from a party in a case, and issued an injunction in the defendant's favor. *Dennis*, 449 U.S. at 25.

Carmen Auto points to a bribery scandal involving Clinton Township officials. Clinton Township has nothing to do with this case involving the City of Detroit. Plus, none of the bribery allegations involve the towing companies involved in this case. (R. 31, PID 981; R. 35, PID 1015.) And even if the towing contracts were obtained illegally, it does not alter the baseline here: Carmen Auto cannot show that anyone from the towing companies bribed public officials to tow Carmen Auto's cars. Thus, nothing in the record suggests the towing companies were anything but private contractors.

So the towing companies have carried their summary judgment burden. Carmen Auto cannot show that the towing companies were state actors nor can Carmen Auto establish that the towing companies' conduct was "fairly attributable to the state." Accordingly, Carmen Auto

15

cannot establish the second element of a § 1983 claim. As there are no genuine issues of material fact, summary judgment in favor of the towing companies is appropriate.

**D.**

The Court has granted the defendants summary judgment on all of Carmen Auto's claims arising under federal law. That leaves only Carmen Auto's state-law claims. (R. 1, PID 7–15.)

When, as here, the federal claims are dismissed before trial, and only state claims remain, federal courts often decline to exercise supplemental jurisdiction over the state-law claims. *See, e.g.*, *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). In deciding whether to exercise jurisdiction, the Court's task is to weigh "judicial economy, convenience, fairness, and comity." *Id.*

Here, the factors weigh in favor of dismissal. To be sure, this case has been on the Court's docket since 2016. In that time, the parties have completed extensive discovery. But nothing prevents the parties from using that discovery in the state courts. Moreover, Carmen Auto filed these claims three months after the tow operation. As the statutes of limitations have been stopped during the pendency of this litigation, *see Artis v. District of Columbia*, 138 S.Ct. 594, 598 (2018), Carmen Auto should have no trouble re-filing its claims in state court. Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state claims.

**IV.**

To conclude, the Court GRANTS the City Defendants' motion for summary judgment. (R. 26.) Carmen Auto cannot establish Fourth Amendment or procedural due process violations and thus cannot establish the first element of a §1983 claim. Likewise, the Court GRANTS the towing companies' motion for summary judgment. (R. 24.) Carmen Auto cannot establish that the towing companies were state actors and therefore cannot establish the second element of a § 1983 claim.

Finally, the Court declines to exercise its supplemental jurisdiction over the remaining state-law claims.

SO ORDERED

Dated: March 15, 2018

s/Laurie J. Michelson
LAURIE J. MICHELSON
U.S. DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 15, 2018.

s/Shawna C. Burns, on behalf of
Keisha Jackson, Case Manager to the
Honorable Laurie J. Michelson